RUSSELL *v.* RUSSELL.

CANCELLATION OF INSTRUMENTS—DEEDS—MENTAL INCOMPETENCY
—UNDUE INFLUENCE—FRAUD—EVIDENCE—SUFFICIENCY.

> On a bill by a father against his son and wife to cancel a deed
> of the father's farm on the ground of mental incompetency,
> fraud, and undue influence, evidence examined, and *held*,
> that though it could not be said that the complainant was
> incompetent at the time he executed the deed, the defendant
> intended to acquire all his father's property by whatever
> means necessary to bring it about, and by fraud and a species
> of undue influence succeeded in accomplishing his purpose.

Appeal from Hillsdale; Chester, J. Submitted October 21, 1907. (Docket No. 97.) Decided December 30, 1907.

Bill by Henry L. Russell against Wilbur C. Russell and Roah L. Russell to set aside a deed on the ground of fraud and undue influence. From a decree for complainant, defendants appeal. Affirmed.

*B. E. Sheldon* and *C. A. Powell*, for complainant.

*C. A. Shepard* and *A. L. Guernsey*, for defendants.

BLAIR, J. The bill of complaint in this suit is filed by the father against the son and his wife to procure the cancellation of a deed executed by complainant to his son and his son's wife, as tenants by entirety, on the 4th day of May, 1901. The bill alleges that at the time of the execution of this deed the vendor was, temporarily at least, mentally incompetent to execute a valid deed and that the same was obtained by fraud and undue influence exercised upon the grantor by the defendant Wilbur.

At the time of the execution of the deed, the complainant was 71 years of age, had recently lost his wife and was greatly affected thereby. Defendants, for some time

prior to November, 1897, had been living at Angola, Indiana. About November 30, 1897, they returned to Hillsdale county and resided with complainant and his family during the winter. At the time of his return, defendant Wilbur had a few dollars in money, not to exceed 25, some household goods, and 40 acres of land heavily incumbered. In the spring, complainant and his son Wilbur arranged for the farming of complainant's land, consisting of the homestead 40 acres and 87 acres additional, together with defendant's 40 acres, for a term of years. To induce defendant to enter into this arrangement and to help him, complainant gave to the defendant a half interest in the team, stock, farming utensils, etc., and the proceeds of their joint labors were to be equally divided. It was understood that this arrangement was to continue for five years. Complainant's wife died in April, 1900, and at the end of that season, by mutual consent, the parties sold off the tools, farming implements and other personal property to the amount of $964, which was equally divided, and defendant Wilbur afterwards sold $400 worth of the joint property and kept it all. The purpose of this sale, at least as understood by complainant, was to get rid of the old tools and personal property and replace it with new as soon as practicable and in the meantime lease the place to some one else. After the sale of the personal property, the defendant declined to continue the farming business longer with complainant, but declared his intention to leave him and go to Oklahoma. Although complainant seems to have been a man of very good health, considering his age, nevertheless, his ability to work and carry on the farm alone was considerably impaired; he was broken in spirits from the loss of his wife; his other son and his daughter were unable to make a home for him or take up the burden of carrying on the farm with him; and it seemed to him imperative that he should make some arrangement with his son Wilbur to induce him to remain and carry out the original understanding, and for that purpose, on the 27th day of

August, 1900, he executed to his son Wilbur a deed of the homestead 40, containing, however, the following reservation:

"It is understood between the said parties that said first party has the right to live with said second party for two years or during the term of his natural life. At the expiration of said two years, should said second party wish to leave said place, said lands shall revert back to said first party; or should said second party die before his wife does, then said land shall revert back to said first party."

It was the intention of the complainant at the time of making this deed of the homestead to retain the 87 acres for the benefit of his other two children, supposing that his son Wilbur would continue to assist him in the carrying on of the farm and the paying off of the indebtedness by way of mortgage against the same.

We are satisfied from the evidence in the case that Wilbur fully understood his father's wishes and intentions but, notwithstanding such knowledge, intended to get the entire farm for himself, and to that end, taking advantage of his father's circumstances, by threats of leaving him and, at times, threatening him, and continually nagging at him, induced complainant to make the deed of May 4, 1901, which is the deed sought to be set aside. That deed conveyed the homestead 40, which had previously been conveyed, as well as the 87 acres not theretofore conveyed, and defendants executed to complainant at the same time a quitclaim deed of the same premises,—

"During the term of his natural life, * * * together with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, to have and to hold the said described lands to the said party of the second part for the term of his natural life. * * * It is expressly understood by both said parties that at the death of said second party this indenture shall be null and void.".

This deed was, substantially, without consideration,

other than an oral agreement, as to the terms of which the parties disagree, and an agreement by defendant to erect a monument to cost $150. Complainant understood from his oral agreement with defendant Wilbur that Wilbur was to work the farm. He testified:

" When I deeded him the 87 acres a year afterwards he gave me a life lease on the homestead as well as that, and he gave me that as security to protect me, and nothing was said about that he was to board me and support and care for me; I was going to stay there on the place; I considered it my property under my life lease; while I owned it he had to work it, but he didn't work it; that was the understanding, that he was to stay with me and work it, he and I together. All I got was my life lease. No share that I was to have specified, only the life lease. I suppose the object in getting the life lease was to protect me, so I couldn't be turned out, and I talked it. He took the 40 acres subject to the incumbrance; he assumed the indebtedness on the 87 acres the same as he did the other. It was not talked over; simply the deed made out and the life lease given in exchange; read by itself just what it was, and that was all there was of it. There was nothing said about the life lease when I gave him the 40 the year before, for I intended to keep this 80 for the other children when I got through with it. The 87 acres was worth at that time in the neighborhood of $30 or $35 an acre. The mortgage on it was $1,250 and the interest had been kept up. The understanding was that we were to work the place together. The place was to pay the taxes. He went right on and took charge of the place; the first year he rented it out. He had what he got off the place, and the second year, and the third year, and the fourth year, all the same, and the fifth; I said nothing; there was no chance to say anything, unless we had war all the time.

"For my deed of May 4th, 1901, I did not get any consideration at all; nothing but the life lease. And that life lease, I think I can safely say, that he had the whole benefit of it, without an exception; I have never had anything at his hands from that life lease, except it might be a little underwear of $3.25 and the doctor bill of blood poisoning about $16."

At the time of executing the deed of the 87 acres it

was incumbered by a mortgage of $1,250 and the 40 was incumbered by a mortgage of about $1,200.

"I expected to have the use of this place; have all the crops raised on the place; Wilbur was to pay all the debts, pay the taxes, keep up the road work, but I was to work with my boy and help him through with that. I expected to stay right with my boy and work with him as though he was on shares in this matter. I expected Wilbur to pay all these debts, pay the mortgage, the indebtedness on this 87 acres of land. I did expect the proceeds of the farm, and then I was to use it in my discretion in paying up the debts; I was going to live on that 87 acres of land. I could have taken the money and put it in my pocket if I had been a mind to; done as the rest of them did, perhaps, but I didn't do it that way."

Afterwards, complainant agreed with defendant Wilbur to execute a deed of the homestead 40 to one Kroh for $2,500, upon the understanding that the balance over the amount required to discharge the mortgage should be applied upon the mortgage upon the 87 acres. Defendant Wilbur testified:

"When I sold this 40 there was $1,100 equity in it. Father signed the deed with me to sell it. I took the $1,100 myself when I got it. I couldn't get it at that time. I didn't get it until fall. I didn't give father a cent of it. Didn't give him a cent for his interest in the 40. I told father that with the big debt there was on the place; and run down as it was, that I didn't care to stay there and take chances on the sickness that we might have. And that I would rather go to town and send the children to school and reduce the debt in that way. I got the money in my own pocket. Every cent of it, yes, sir, and I invested that money for his benefit as well as ours. I got the whole title in ourselves and canceled his life lease; he said all he cared for was a home. He hasn't anything to show for the equity he once had in the 40 acres, but he has got this 87 acres that I have went on and proved. He had that before, but not in as good shape. He didn't gain anything so far as dollars and cents are concerned, unless it made our home for him and me both in safer shape than it was before, and that was his talk and mine together, that that was what it would be. I didn't put

the $1,100 in my pocket, I put it in a good home for him. I put it in that house and lot. The title is in our own name. He hasn't any writings but he has an interest in it, because his home has been there. I got everything I raised off the 87 acres after I sold the 40, except what his turkeys ate and what he ate. I had the proceeds of the 127 acres for three years and after that the proceeds of the 87 acres up till the present time. Father had a bare living out of it. And what turkeys he sold. I haven't let my father have any money since I got a deed of this place. I made provisions for him to have his money by raising these turkeys. I wasn't to give him anything. I have not let him have a cent."

The house and lot referred to by defendant Wilbur was in Pioneer, Ohio.

It is apparent from their testimony that neither of the parties intended to enter into such legal relations as they actually did assume by their respective deeds conveying the fee and life estate in the 127 acres. The complainant did not understand that the defendant was under no legal obligation to remain on the land or assist him in any way in carrying on the farming operations and discharging the burdens of taxation, the mortgage, etc. On the other hand, the defendant did not understand that complainant was entitled to put him off the farm and run it for his own benefit. It seems clear that the deeds do not embody the actual understanding of the parties. But even if the real agreement was as testified by defendant, and the quitclaim deed was intended merely as a security for the carrying out of his oral agreement to support complainant for life on the premises, we are of the opinion that defendant did not enter into it in good faith with the intention of carrying it out, but that it was merely one of the steps towards getting all of the complainant's property into his own hands and subject to his own control, freed from any legal claim upon it, which the testimony indicates was defendant's design, from the outset. To this end, the surplus arising from the sale of the homestead 40, which should have been paid on the mortgage on the

87 acres, was invested in property in another State, whither defendant removed with complainant, in which lands complainant was given no interest whatever. It is apparent that defendant intended to make his home in Ohio and it is not unreasonable to infer that he intended to convert the remaining Michigan property into cash as soon as practicable and use it for his own purposes in Ohio. We do not think it a reasonable conclusion from the testimony in this case that complainant was deeding away all of his property for the purpose of securing to himself a bare living, or that he, of his own free will, subjected himself entirely to the defendant's notions and abandoned his home on his own farm, the securing of which was the main object of all his arrangements with his son.

After a careful consideration of the testimony, we do not think it can be held that the complainant was incompetent to make the deed in question or the various contracts entered into by him. We are satisfied, however, that the defendant Wilbur returned to Hillsdale county with the intention of acquiring all of his father's property by whatever means were necessary to bring such result about, and that he has, by fraud and a species of undue influence, succeeded in accomplishing his purpose. We are strengthened in this conclusion by the fact that the trial judge, who had better opportunities than we have for determining the credibility of the witnesses, came to the same conclusion and entered a decree setting aside the deed but charging the land with a lien in favor of defendants for the sum of $502.33, "to reimburse them for the moneys expended upon said land for the benefit of the complainant and for other things which, according to the finding of the court, the complainant ought to pay the defendants."

Decree affirmed, with costs to complainant.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.